UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| 316 COURTLAND AVENUE, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>FRONTIER COMMUNICATIONS CORPORATION, SNET AMERICA INC.,<br><br>*Defendants.* | Civil No. 3:17-cv-01336-JBA<br><br>September 12, 2022 |

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff 316 Courtland Avenue, LLC brings this action against Defendants Frontier Communications Corporation and SNET America, Inc, former tenants of 316 Courtland Avenue. Frontier is the parent company of SNET. Plaintiff alleges SNET's activities at the property contaminated the property and Defendants failed to reimburse Plaintiff for environmental mitigation efforts. (Second Am. Compl. [Doc. #58].) Plaintiff specifically alleges that Defendants' actions violated the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") (Count One); were negligent per se violations of the Connecticut Water Pollution Control Act ("WPCA") (Count Two); violated the Conn. Gen. Stat. § 22a-452 (Count Three); violated the Connecticut Environmental Protection Act ("CEPA") (Count Four); unjustly enriched Defendants (Count Five); were negligent (Count Six); and breached the lease (Count Seven). (*Id.*)

Plaintiff moved for summary judgment on Count Seven [Doc. # 74]. Defendants cross-moved for summary judgment on all counts [Doc. # 75]. For the reasons that follow, the Court grants Defendants' summary judgment motion on Count One, declines supplemental jurisdiction over the remaining state law counts, and thus dismisses Plaintiff's motion for summary judgment without prejudice.

1

**I.      Background**

     **A.      Establishment Classification**

From 1972 to 2016, Defendant SNET leased a portion of the property, which Plaintiff purchased in 2013, for use as a vehicle maintenance facility. (Pl.'s Loc. R. 56(a)(1) Stmt. ¶¶ 3, 7.) As part of its due diligence before purchasing the property, Plaintiff retained Fuss & O'Neill to conduct a Phase I environmental site assessment. (*Id.* ¶ 7.) During this assessment, Fuss & O'Neill discovered that the Connecticut Department of Energy and Environmental Protection ("DEEP") hazardous waste manifest database listed a July 1997 shipment of 30 gallons of sulphuric acid from the property. (*Id.* ¶¶ 11-12.) Plaintiff asked both the then-owner, Sivan, and SNET for copies of the manifest for this shipment, but neither Sivan nor SNET were able to produce it. (*Id.* ¶¶ 13, 22.)

Fuss & O'Neill then informed Plaintiff that because of this transfer of hazardous material, unless Plaintiff could provide documentation showing that the sulphuric acid was not generated within a single month, DEEP would likely consider the property to be an Establishment under the Connecticut Transfer Act. (*Id.* ¶¶ 15-16.) The Transfer Act, Conn. Gen. Stat. § 22a-134 et seq., applies to the transfer of a property that is classified as an "Establishment." Conn. Gen. Stat. § 22a-134a, including any property or business at which more than 100 kilograms of covered hazardous waste is generated per month. Conn. Gen. Stat. § 22a-134(3). When an Establishment is transferred, one of several forms must be filed with DEEP. Conn. Gen. Stat. § 22a-134a(c). The form at issue in this case is Form III, which states that "a discharge, spillage, uncontrolled loss, seepage or filtration of hazardous waste or a hazardous substance has occurred at the establishment or the environmental conditions at the establishment are unknown" and certifies that the party signing "agrees to investigate the parcel in accordance with prevailing standards and guidelines and to remediate pollution caused by any release of a hazardous waste or hazardous substance from the establishment in accordance with the remediation standards." Conn. Gen. Stat. § 22a-134(12).

Plaintiff claims it again asked SNET, both directly and through Sivan, to investigate the source of the acid and look for the manifest. (Pl.'s Loc. R. 56(a)(1) Stmt. ¶¶ 18-26.) SNET was unable to locate the original manifest. (*Id.* ¶ 27.) Defendants, however, dispute that Plaintiff sought this information from SNET directly, arguing that it instead sought the information from AT&T, at the time SNET's parent company. (Defs.' Opp'n [Doc. # 84] at 11, n.14.) Plaintiff maintains that in its conversations with representatives of AT&T, the representatives were speaking on behalf of SNET. (Pl.'s Reply [Doc. # 85] at 6-7.)

Ultimately, in order to avoid future liability if DEEP later classified the property as an Establishment, Plaintiff filed a precautionary Form III, with Plaintiff as the certifying party, and attempted to convince DEEP that the property should not be classified as an Establishment. (Pl.'s Loc. R. 56(a)(1) Stmt. ¶¶ 31, 35.) In 2014 DEEP nonetheless classified the property as an Establishment, stating that without other evidence DEEP would consider the sulphuric acid to have been generated within a single month. (*Id.* ¶ 36.)

In 2019, after Plaintiff had carried out extensive remediation efforts, detailed below, Defendants' counsel located the missing transfer manifest. (*Id.* ¶ 68.) The manifest used the property's EPA identification number but listed the address where the sulphuric acid was generated as SNET's central office. (*Id.* ¶¶ 69-70.)

### B.   Remediation Efforts

Once the property had been classified as an Establishment, the Transfer Act required Plaintiff to remediate several areas of the property. (Pl.'s Loc. R. 56(a)(1) Stmt. ¶¶ 37, 39.) Plaintiff retained Fuss & O'Neill to determine how to proceed with remediation. (*Id.* ¶ 39.) The project was overseen by John Hankins, a Senior Vice President at Fuss & O'Neill and a Connecticut licensed environmental professional (LEP). (Hankins Decl. [Doc. # 74-24] ¶ 2.)

Fuss & O'Neill's 2013 Phase I report, issued before Plaintiff purchased the property, had identified 10 areas of concern ("AOCs"), where there was the "potential" for environmental contamination. (*Id.* ¶ 38; Pl.'s Ex. 13 [Doc. # 75-15] at 19-21; Defs.' Loc. R.

56(a)(1) Stmt. ¶ 26.) Beginning in 2014, Fuss & O'Neill carried out Phase II and Phase III investigations to determine whether any of these AOCs would need to be remediated under the Transfer Act. (Pl.'s Loc. R. 56(a)(1) Stmt. ¶ 7.) They determined that AOC-1 (southeastern fill area), AOC-4 (former hydraulic lift area), and AOC-8 (western storage area) would require remediation. (*Id.* ¶¶ 39-40, 47, 58.)

AOC-1 had been contaminated by petroleum, related to historic fill (*Id.* ¶ 41.) The contamination was under an existing paved parking lot, so to remediate Plaintiff repaved the lot and recorded an environmental land use restriction ("EULRA") prohibiting excavation of AOC-1 without DEEP approval. (*Id.* ¶¶ 43, 44.) A small portion of AOC-1 contained polychlorinated biphenyls, and this portion was excavated and removed. (*Id.* ¶¶ 45, 46.)

AOC-4, the area surrounding a hydraulic lift system used by SNET, was contaminated by petroleum. (*Id.* ¶ 49-50, 54.) Phase II sampling did not show any contamination, but in 2016 Plaintiff observed free-phase hydraulic oil at two of the lift locations when the lifts were removed as part of the SNET facility being decommissioned. (Defs.' Ex. 18 (Doc. # 75-20] at 10.) After the 2016 oil release, further sampling was done by Fuss & O'Neill, showing soil petroleum contamination. (*Id.* at 23-24.) Fuss & O'Neill attributed this contamination to Defendants' hydraulic lifts. (*Id.* at 24.) Defendants, however, argue that, with the exception of the free-phase hydraulic oil, Plaintiff has not shown that the contamination is attributable to SNET. (Defs.' Resp. to Pl.'s Loc. R. 56(a)(1) Stmt. [Doc. # 84-1] at 17; Pl.'s Loc. R. 56(a)(1) Stmt. ¶ 49.) To remediate AOC-4, Plaintiff excavated the contaminated soil, ultimately removing several thousand tons of soil. (Pl.'s Loc. R. 56(a)(1) Stmt. ¶ 55.)

AOC-8 had soil contaminated with polycyclic aromatic hydrocarbons and heavy metals (arsenic and lead), soil contaminated with petroleum, and an area under the parking lot contaminated with petroleum. (*Id.* ¶ 59.) Plaintiff remediated AOC-8 by excavating the contaminated soil. (*Id.* ¶ 60.)

Following a final Transfer Act report and filing by Fuss & O'Neill, DEEP issued a Letter of No Audit [Doc. # 74-14], stating that the submission had been accepted and the commissioner did not intend to audit it.

According to Plaintiff, the total cost of remediation was $1,483,258. (*Id.* ¶ 66.) Broken down, the costs were $328,843 for AOC-1, $901,949 for AOC-4, $101,788 for AOC-8, and $150,680 in general costs. (*Id.* ¶ 66.) Defendants have paid Plaintiff $168,263 reimbursement. (*Id.* ¶ 67.)

**II.   Standard**

Summary judgment is appropriate if, "assess[ing] the record in the light most favorable to the non-movant and [and] draw[ing] all reasonable inferences in the non-movant's favor," "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (internal ellipses, brackets, and quotation marks omitted). There is a genuine dispute of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden of showing that there is no genuine dispute of material fact rests with the moving party. *Weinstock*, 224 F.3d at 41. Once that showing is made, the non-moving party must "come forward with materials . . . setting forth specific facts showing that there is a genuine issue of material fact to be tried." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).

To create a dispute of material fact, the non-moving party cannot "rely[] on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Id.* (citations omitted); *see also Nuchman v. City of N.Y.*, 639 F. App'x 48, 49 (2d Cir. 2016) ("The nonmoving party cannot rely on mere speculation or conjecture or conclusory allegations or denials, but instead must offer specific evidence sufficient to create a genuine issue of material fact." (internal quotation marks omitted)); *Pinto v. Texas Instruments*, 72 F. Supp. 2d 9, 11 (D. Conn. 1999) (explaining that to

5

defeat a motion for summary judgment, the non-moving party's evidence must be "significantly probative").

### III.   Discussion

#### A.   Count One: CERCLA

CERCLA has two primary purposes: "(1) to encourage the timely cleanup of hazardous waste sites; and (2) to place the cost of that cleanup on those responsible for creating or maintaining the hazardous condition." *W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 88 (2d Cir.2009) (internal brackets and quotation marks omitted). To accomplish these purposes, CERCLA "authorizes parties to recoup money spent to clean up and prevent future pollution at contaminated sites or to reimburse others for cleanup and prevention at contaminated sites." *Consol. Edison v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005). Under 42 U.S.C. §§ 9607(a)

> any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for . . . necessary costs of response incurred by any other person consistent with the national contingency plan.

Additionally, under 42 U.S.C. § 9613(f)(1) "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action . . . under section 9607(a) of this title." 42 U.S.C. § 9613(f)(1). In general, courts liberally construe CERCLA to further Congress' objectives when passing the law. *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 132 (2d Cir. 2010).

To survive summary judgment, "the party seeking contribution [under CERCLA] need not establish the precise amount of hazardous material discharged or prove with certainty that a [Potentially Responsible Party] discharged the hazardous material." *Niagara Mohawk,* 596 F.3d at 132. Furthermore, "[w]hen determining CERCLA liability, there is nothing

objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain," and "CERCLA liability may be inferred from the totality of the circumstances as opposed to direct evidence." *Id.* at 131, 136 (internal quotation marks omitted).

### 1. Petroleum Exclusion

CERCLA's definition of hazardous substances explicitly excludes petroleum, 42 U.S.C. § 9601(14), so CERCLA claims, barring a few narrow exceptions, generally cannot succeed if the claimed source of pollution is petroleum or a petroleum derivative. *See White Plains Housing Auth. v. Getty Props. Corp.*, No. 13–CV–6282, 2014 WL 7183991 (S.D.N.Y. Dec. 16, 2014) (finding that the CERCLA petroleum exclusion would bar claims related to gasoline pollution but not benzene standing alone, since benzene is separately identified as a hazardous substance in CERCLA). Defendant, as the party asserting the petroleum exclusion, bears the burden of proving that it applies. *See Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 896–97 (10th Cir. 2000); *Johnson v. James Langley Operating Co., Inc.*, 226 F.3d 957, 963 n.4 (8th Cir. 2000).

As a threshold matter, Defendants claim that Plaintiff's CERCLA claim should fail under the petroleum exclusion. (Defs.' Mem. [Doc. # 75-1] at 27.) Because, as discussed below, Plaintiff has failed to make out all the prima facie elements of a CERCLA claim, it is not necessary to reach this issue.

### 2. Conformance With the National Contingency Plan

To prevail on a CERCLA claim, a plaintiff must make a prima facie showing of the following:

> (1) the defendant is an "owner" or is otherwise liable under 42 U.S.C. § 9607(a)(1)–(4); (2) the site is a "facility" as defined by 42 U.S.C. § 9601(9); (3) there has been a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or the threat; and (5)

7

> the costs and response conform to the National Contingency Plan.

*Price Trucking Corp. v. Norampac Indus., Inc.*, 748 F.3d 75, 80 (2d Cir. 2014). Defendants argue that Plaintiff's CERCLA claim cannot survive summary judgment because, among other alleged issues, Plaintiff's remediation process did not provide the opportunity for public participation required to conform to the National Contingency Plan ("NCP"). (Defs.' Mem. [Doc. # 75-1] at 28; Defs.' Reply [Doc. # 86] at 4 n.5) To demonstrate conformance, Plaintiff relies on the fact that the property was brought into compliance with the Transfer Act and DEEP issued a no-audit letter. (Pl.'s Mem. in Opp'n [Doc. # 82] at 16). Plaintiff also, at the August 8, 2022 oral argument, maintained that the involvement of Fuss & O'Neill, whose employees are state-licensed LEPs, provides sufficient state regulatory oversight to satisfy the NCP's public participation requirement.

The NCP is "essentially the federal government's toxic waste playbook, detailing the steps the government must take to identify, evaluate, and respond to hazardous substances in the environment." *Niagara Mohawk,* 596 F.3d at 136. Its creation was directed by CERCLA, and it was established through EPA regulation. *United States v. Hardage*, 982 F.2d 1436, 1442 (10th Cir. 1992); 40 C.F.R. §§ 300-300.1105. Four factors are used to analyze whether remediation efforts conform to the NCP: "(1) appropriate site investigation and analysis of remedial alternatives; (2) compliance with the scoring, development and selection criteria for removal and remedial actions; (3) selection of a cost-effective remedy; and (4) opportunity for public comment." *Abb. Indus. Sys., Inc. v. Prime Tech, Inc.*, 32 F. Supp. 2d 38, 43 (D. Conn. 1998). When a private party moves to recover its response costs under CERCLA, that party bears the burden of proving conformance with the NCP. *Commerce Holding Co., Inc. v. Buckstone*, 749 F. Supp. 441, 444 (E.D.N.Y. 1990).

The NCP regulations state that "[p]rivate parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action." 40 C.F.R. § 300.700(c)(6). This language was adopted in recognition of the fact that "[t]he

public . . . have a strong interest in participating in cleanup decisions that may affect them, and their involvement helps to ensure that these cleanups—which are performed without governmental supervision—are carried out in an environmentally sound manner." National Oil and Hazardous Substances Pollution Contingency Plan, 55 Fed. Reg. 8666 (Mar. 8, 1990)

However, while public comment is an important concern of the NCP, lack of public comment is not an absolute bar to CERCLA liability. *See Bedford Affiliates v. Sills*, 156 F.3d 416, 428 (2d Cir. 1998), *overruled on other grounds by W.R. Grace & Co.-Conn.*, 559 F.3d at 89–90. The EPA expressly recognized that requiring strict compliance with a rigid set of rules would not encourage private parties to voluntarily clean up environmental hazards, adopting instead "a case-by-case balancing approach that would evaluate the cleanup effort as a whole to ensure the quality of the cleanup while removing undue procedural obstacles to National Plan consistency." *Id*.

Under this approach, lack of public comment may be ameliorated by significant government involvement in clean-up efforts. *Id*. In *Bedford Affiliates*, the court found that formal public comment was not necessary to demonstrate NCP conformance because of the consistent involvement of state officials in investigating and implementing remediation efforts. *Id.* The court concluded that "[s]uch extensive involvement of a government agency charged with the protection of the public environmental interest is an effective substitute for public comment." *Id.* Similarly, in *NutraSweet Co. v. X–L Eng'g Co.* the court determined that NutraSweet had conformed to the NCP because of the extensive involvement of the state environmental agency, which approved the remediation plan, monitored the remediation plan, and determined when the remediation was complete. 227 F.3d 776, 791 (7th Cir. 2000). Another method to show conformance, in light of states' authority to resolve CERCLA liability, is to complete remediation under a consent order with the state. *Niagara*, 596 F.3d at 137.

Plaintiff seeks to stretch these holdings one step further in claiming that the involvement of LEPs accomplishes the same function as oversight from the public or a state environmental agency. This argument is belied by the state's relaxed regulatory approach to LEPs. Connecticut's LEP program permits regulators to—as they in fact did here (DEEP Letter of No Audit [Doc # 74-14])—approve LEPs' remediation activities without an independent state investigation. 1995 Conn. Pub. Acts 190, § 2 ("Any final remedial action report submitted to the commissioner for such a property by a licensed environmental professional shall be deemed approved unless, within sixty days of such submittal, the commissioner determines, in his sole discretion, that an audit of such remedial action is necessary").[1] Furthermore, when state involvement stands in for public participation, an element of public accountability is maintained, but substituting LEPs for state officials "remov[es] the responsibility for assessing public risk one step further from an accountable public servant [and] could make it more difficult for community activists to obtain full disclosure regarding contamination at a site." Douglas A. McWilliams, *Environmental Justice and Industrial Redevelopment: Economics and Equality in Urban Revitalization*, 21 Ecology L.Q. 705, 751 (1994).

For these reasons, the involvement of LEPs does not figure in the analysis of whether Plaintiff conformed to the NCP. Plaintiff's only remaining evidence of conformance is the DEEP Letter of No Audit.  This letter reflects an agency decision to not review the final remedial action, rather than an active review and affirmative approval. 1995 Conn. Pub. Acts 190, § 2. In fact, the letter explicitly states that DEEP may not have reviewed Fuss & O'Neill's work or application of the applicable regulations. (DEEP Letter of No Audit at 2.) Even if the letter did represent affirmative final approval of Plaintiff's remediation efforts, it would not

---

[1] In general, when private environmental contractors are used, "[g]iven the lack of state resources to devote to oversight, the states will often . . . find themselves rubber-stamping" remediation efforts. Joel B. Eisen, *"Brownfields of Dreams"?: Challenges and Limits of Voluntary Cleanup Programs and Incentives*, 1996 U. Ill. L. Rev. 883, 1022 (1996).

be equivalent to "comprehensive input" across all stages of the remediation effort that is necessary to show conformance with the NCP. *Bedford Affiliates*, 156 F.3d at 428. As a matter of law, Plaintiff has failed to show conformity with the NCP, a requirement for proving a CERCLA violation, and Defendants' motion for summary judgment on Count One is, therefore, granted.

### B. Jurisdiction Over Remaining Claims

"[J]uristiction is an issue that each federal court has a duty to examine sua sponte." *Soto v. United States*, 185 F.3d 48, 52 (2d Cir. 1999). This Court's federal question jurisdiction over this case stems from the CERCLA claim. 28 U.S.C. § 1331. The Court may then exercise supplemental jurisdiction over the state law claims. 28 U.S.C. § 1367.

A court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "In the usual case in which all federal-law claims are eliminated before trial, that balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). While the decision to decline supplemental jurisdiction is discretionary, "that discretion is, of course, subject to boundaries," particularly when all federal claims have been dismissed before trial. *Oneida Indian Nation of N.Y. v. Madison Cnty.*, 665 F.3d 408, 437 (2d Cir. 2011). This is particularly true when the state law claims require "constru[ing] a novel state Act not yet reviewed by the State's highest court." *Oneida Indian Nation*, 665 F.3d 408, 438-39 (2d Cir. 2011) (quoting *Arizonans for Official English v. Ariz.*, 520 U.S. 43, 79 (1997)); see also 28 U.S.C. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction . . . if the claim raises a novel or complex issue of State law.").

As the CERCLA claim is being dismissed, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. Not only have "all federal-law claims [been] eliminated before trial," *Carnegie–Mellon Univ*, 484 U.S. at 350 n.7, but many of the remaining

11

state law claims involve highly disputed questions of law that have not been resolved by the Connecticut Supreme Court. Among other issues, there is significant disagreement among superior courts and federal courts Connecticut over whether the WPCA can serve as the basis for a negligence per se claim. *Compare Innis Arden Golf Club v. Pitney Bowes, Inc.,* 514 F. Supp. 2d 328, 336 (D. Conn. 2007) (explaining that because of the WPCA's purpose "as a broad administrative measure, combined with the requirement that negligence per se actions be based on a clear statutory standard of behavior aimed at individuals, this Court again conclude[d] that the broad proscription contained in § 22a–427 may not be used by individuals as a standard for negligence per se actions") *and Einbinder v. Petro, Inc.*, No. AANCV116005353S, 2012 WL 1139032, at *9 (Conn. Super. Ct. Mar. 9, 2012) (finding that the WPCA cannot support a negligence per se claim) *with Coastline Terminals of Connecticut, Inc. v. USX Corporation,* 156 F. Supp. 2d 203, 210 (D. Conn. 2001) (finding that the WPCA can be the basis of a negligence per se claim) *and Oxford Bd. of Educ. v. EnvironConsult, Inc.*, No. CV085011175S, 2010 WL 1493508, at *4 (Conn. Super. Ct. Mar. 12, 2010) (permitting a negligence per se claim based on the WPCA to proceed).

Superior courts are also divided over which statute of limitations should apply to Counts Three, Four, and Six. *See Main St. Bus. Mgmt., Inc. v. Moutinho,* No. FBTCV18-6073550S, 2019 WL 4060738, at *5 n.5 (Conn. Super. Ct. Aug. 13, 2019) (reviewing the disagreement over which statute of limitations should apply to Conn. Gen. Stat. § 22a-452); *Devino v. Waterbury Housewrecking Co.*, No. CV04-4002076, 2006 WL 337253, at *5 (Conn. Super. Ct. Jan. 27, 2006) (finding that no statute of limitations applies to plaintiff's Conn. Gen. Stat. § 22a-16 claim and highlighting the disagreement over whether Conn. Gen. Stat. § 52-577 should instead apply); *Cholewa v. Hill*, No. KNLCV15-6025338S, 2016 WL 7974278, at *7 (Conn. Super. Ct. Dec. 19, 2016) (discussing the lack of clarity over whether the applicable statute of limitations for negligence claims related to environmental cleanup is Conn. Gen. Stat. § 52-584 or Conn. Gen. Stat. § 52-577c(b)). These discordant interpretations are more

appropriately resolved in state court. Given this disposition, Plaintiff's motion for summary judgment regarding Count Seven [Doc. # 74] is dismissed without prejudice

## IV. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. # 75] is GRANTED on Count One, and the court declines supplemental jurisdiction over the remaining claims. The Clerk is requested to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 12th day of September 2022